1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8
9   NORMA SALINAS,                              CASE NO. 1:10-cv-01615-LJO-SMS

10                      Plaintiff,

11        v.                                      FINDINGS AND RECOMMENDATIONS
                                                 RECOMMENDING THAT THE
                                                 DISTRICT COURT AFFIRM AGENCY'S
12   MICHAEL ASTRUE,                              DENIAL OF BENEFITS
     Commissioner of Social Security,

13
                        Defendant.
14   _____/

15

16        Plaintiff Norma Salinas, proceeding *in forma pauperis*, by her attorneys, Law Offices of

17   Jeffrey Milam, seeks judicial review of a final decision of the Commissioner of Social Security

18   ("Commissioner") denying his application for supplemental security income  ("SSI") pursuant to

19   Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act").  The matter is

20   currently before the Court on the parties' cross-briefs, which were submitted, without oral

21   argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.  Following a

22   review of the complete record and applicable law, this Court finds the decision of the

23   Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a

24   whole and based on proper legal standards.  Accordingly, this Court recommends that the District

25   Court deny Plaintiff's appeal.

26   **I.    Administrative Record**

27        **A.    Procedural History**

28        On November 29, 2006, Plaintiff filed a SSI application, alleging disability beginning

1

1   May 1, 2003.  Her claims were denied initially on June 12, 2007, and upon reconsideration on

2   November 1, 2007.  On December 31, 2007, Plaintiff filed a timely request for a hearing.

3         Plaintiff appeared and testified at the hearing on May 29, 2009.  On September 1, 2009,

4   Administrative Law Judge Michael J. Haubner denied Plaintiff's application.   The Appeals

5   Council denied review on July 8, 2010.  On September 6, 2010, Plaintiff filed a complaint

6   seeking this Court's review.

7         **B.**  **<u>Factual Record</u>**

8         Plaintiff (born November 23, 1956) has never worked other than occasional babysitting or

9   house cleaning.  Thus, although Plaintiff reported that she last worked May 1, 2003, she has no

10  history of work for which social security (FICA) taxes were paid.  She dropped out of school in

11  the ninth grade, but completed a GED while imprisoned in 1998.

12        Plaintiff's main difficulties were depression and anxiety.  She reported experiencing

13  anxiety attacks three times monthly.  Plaintiff heard voices, although her medications reduced the

14  frequency with which she heard them.  She had high blood pressure and arthritis, which caused

15  her feet and ankles to swell.  Her body was stiff, and she had trouble bending.

16        Plaintiff, who was five feet, five inches tall, weighed 260 pounds.  Although she tried to

17  follow her doctors' direction that she reduce her weight, Plaintiff complied with her diet only

18  about 75 percent of the time and got no exercise other than walking her dog in the front yard.

19  Plaintiff could grip or grasp a coffee cup or pencil for about two minutes before needing to rest

20  for 20 minutes.

21        Plaintiff testified that she has a history of convictions for drug-related offenses.  She last

22  used street drugs five years before the May 29, 2009 hearing.  After her doctors advised that she

23  stop smoking cigarettes, she reduced her use from two packs a day in 2004 to three cigarettes a

24  day by the hearing date.  On November 29, 2006, the agency interviewer noted that Plaintiff was

25  "hyper" and talkative, and smelled of alcohol.  She testified that she stopped drinking alcohol in

26  mid-2007.

27        Plaintiff used inhalers to treat her asthma.  She did not use home oxygen or a nebulizer

28  but claimed to have been hospitalized for treatment of her asthma for two weeks in September

19, 2008.[1]

She testified that she could lift about three pounds without injuring herself, stand for ten minutes, and sit for about 20 minutes.  She could walk half a block at a time.  She needed to rest and elevate her feet for about 20 minutes twice a day.  She could concentrate for about one-half hour before needing to rest for one hour.

Plaintiff lived in her mother's apartment.  She was able to care for her personal needs, including dressing and hygiene.  She was able to perform household chores, including laundry, cooking, and trash removal.  She made her bed and changed the bedding.  Mopping was difficult as it caused her hands to stiffen.  She rarely shopped, although she went to the neighborhood store daily.  Plaintiff cared for a dog and walked it in the front yard.  She watched television all day, for a total of about twelve hours.  She did not socialize but talked on the phone about once a day.  Although Plaintiff's 89-year-old mother was generally able to care for herself, Plaintiff helped her put on her shoes.

**Adult Disability Report.**  Plaintiff reported poor concentration and memory.  She primarily remained in her home.  She was troubled by her emotions and guilt, was sad, and heard voices.  She was easily upset and awoke during the night.  Although she had never worked, Plaintiff became unable to work on May 1, 2003.

**Community Medical Center.**  When Plaintiff was arrested on May 5, 2005, she was taken to the emergency room of Community Medical Center for treatment of an abscess on her thigh.   From May 5 through 7, 2005, she was treated for the abscess and a urinary tract infection before being transferred to jail.  Dr. Maria Vazquez-Campos prescribed Bactrim-DS (antibiotic), Vicodin (as needed for pain), Serax (anti-anxiety), folic acid, thiamine, and multivitamin supplements.  Records noted Plaintiff's history of abusing alcohol and intravenous drugs.

**Valley State Prison.**  The agency record includes physicians' notes during Plaintiff's incarceration at Valley State Prison for Women.[2]  Prison physicians diagnosed Plaintiff with

---

[1]  The record includes no medical records documenting Plaintiff's reported hospitalization.

[2]  Portions of the handwritten notes are indecipherable.

hepatitis C and treated her for seasonal allergies and recurrent allergic rashes and hives.  They continued her prior prescription for Trazadone[3] and prescribed Motrin and Benadryl for her joint pain and allergies.  A trial of Celebrex did not relieve Plaintiff's joint pain.  On June 9, 2005, R.O. Cannon, M.D., noted that Plaintiff was not adequately treating her asthma because she did not use her inhaler properly.

**Drs. Bruny and Spencer.**  Madera radiologists Todd Spencer, M.D., and Stephen Bruny, M.D., F.A.C.R., also treated Plaintiff while she was incarcerated at Valley State Prison.  On November 25, 2003, Spencer evaluated x-rays of Plaintiff's hip, pelvis, and lumbar spine after she fell.  He identified mild degenerative joint disease but found no fracture or dislocation.  On June 13, 2005, Bruny found Plaintiff's chest x-ray normal and noted that, despite degenerative changes in the right sacroiliac region, x-rays of her pelvis and hip were also normal.

**Parole Outpatient Clinic.**  In early November 2005, Nathan Nenadov, LCSW, prepared Plaintiff's initial mental health evaluation for the Parole Outpatient Clinic.  Plaintiff had a long history of polysubstance abuse and had completed at least four treatment programs.  She also reported a suicide attempt in 2003 while in prison: she cut her wrists because she was angry.  Prison physicians prescribed Trazodone and Seroquel.

Plaintiff reported poor sleep and decreased appetite.  Nenadov observed that she was alert and oriented with average intellect, intact memory, and "an adequate fund of information."  She had poor insight into her problems or symptoms.  Nenadov diagnosed:

| | | |
|---|---|---|
| Axis I: | 296.90 | Mood Disorder NOS |
| | 304.00 | Opoid dependence |
| | 304.20 | Cocaine dependency in full remission |
| Axis II: | 799.90 | Diagnosis deferred |
| Axis III: | | Medical concerns: Hepatitis C and asthma by report |
| Axis IV: | | Psychosocial stressors: Parole and legal problems; chronic unemployment; financial problems |
| Axis V: | | GAF=60 |

---

[3]  Trazodone HCl is an antidepressant.  dailymed.nlm.nih.gov/dailymed/archives/fdaDrugInfo. cfm?archiveid=4844 (December 5, 2011).

1    AR 241.[4]

2    When Plaintiff next saw Nenadov, she reported that she had halved her Seroquel dose,

3    which ameliorated its side effect of causing her legs to shake, and questioned whether the

4    Seroquel was necessary.  Nenadov directed her to discuss Seroquel with Dr. Green.  Nenadov

5    reported that Plaintiff was stable and functioning well with no problem or concerns.

6    Psychiatrist Henry Green, M.D., supervised mental health prescriptions.  He continued

7    Plaintiff's trazadone prescription and briefly discontinued Seroquel.  On July 19, 2006, he noted,

8    "There is no psychosis at this time.  Affect is appropriate."  AR 238.  On July 28, 2006, Plaintiff

9    was doing well and expressed a desire to also get off Trazadone soon.

10    On September 18, 2006, Nenadov reported that Plaintiff continued to do well, with her

11    biggest problem being her diet and weight management.  Plaintiff acknowledged that snacking on

12    junk food was her problem, but felt good and was not stressed out about her weight.  Green's

13    brief notes on October 11, 2006, indicated that Plaintiff continued to do well, with no sleep or

14    appetite disturbance.

15    On April 12, 2007, Nenadov prepared a status report indicating that Plaintiff was then

16    prescribed Trazodone and Seroquel.  She was compliant with treatment and medications.

17    Plaintiff was frequently depressed, but not on a daily basis.  She lacked energy and motivation

18    and frequently isolated herself.  She slept well as long as she took her medications.  Plaintiff

19    showed no psychotic symptoms.  She reported no hallucinations, delusions, or suicidal ideation.

20    In a "Medical Source Statement, Psychiatric,"[5] dated July 20, 2007, Green opined that

21    _____

22    [4]  The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall
functioning on Axis V of the diagnosis.  American Psychiatric Association, Diagnostic and Statistical Manual of

23    Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR").  It considers "psychological, social, and
occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in

24    functioning due to physical (or environmental) limitations." Id. at 34.  The first description in the range indicates
symptom severity; the second, level of functioning.  Id. at 32.  In the case of discordant symptom and functioning

25    scores, the final GAF rating always reflects the worse of the ratings.  Id. at 33.
      GAF 60 is at the top of the range GAF 51-60, which indicates "Moderate symptoms (e.g., flat affect and

26    circumstantial speech, occasional panic attack) OR moderate difficulty is social, occupational, or school functioning
(e.g., no friends, unable to keep a job)."  Id. at 34.

27    [5]  Green provided his opinions on five-pages of forms, apparently prepared by Plaintiff's attorney.  The
cover sheet is entitled Medical Source Statement, Psychiatric," and the following four pages were taken from the

28    psychiatric review technique.  Someone annotated the psychiatric review technique pages with regulatory definitions,

Plaintiff had shown marked improvement in her ability to relate and interact with supervisors and co-workers; to understand, remember, and carry out an extensive variety of technical or complex job instructions; to understand, remember, and carry out simple one- or two-step job instructions; to deal with the public; to maintain concentration and attention for at least two-hour increments; and to withstand the pressure and stress associated with an eight-hour workday and day-to-day work activity. She was able to handle funds. Green stated that Plaintiff "[c]ould be functional in 6-9 months." He opined that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence or pace. Green also indicated that plaintiff had experienced one or two episodes of decompensation, but the phrase, "[e]ach of [e]xtende [d]uration" had been stricken from the form. AR 291.

**Dr. Hirokawa.** On December 28, 2006, Greg Hirokawa, Ph.D., prepared a consultative psychiatric evaluation for the agency. Plaintiff told Hirokawa that she experienced depression, anxiety, hearing voices, short-term memory problems, mood swings, sleeping difficulty, withdrawal, poor concentration, and being stressed out. Her primary issues were finances and not returning to prison. Her current medications were Trazodone and Seroquel. Although she had attempted suicide twice, most recently in 2003, she had never been hospitalized for mental health issues. Recent outpatient treatment had been helpful.

Although speech and thought contact were normal, Plaintiff was depressed. She appeared of average intelligence with adequate memory. Nonetheless, her responses to Hirokawa's mental status questions were inadequate or reflected errors.

Plaintiff had a few friends who were not close. She cooked, vacuumed, swept, mopped, and did yard work and laundry. She generally stayed at home and watched television. Hirokawa diagnosed:

Axis I:     Adjustment disorder with mixed emotional features.
            Polysubstance dependence, in reported remission.

added emphasis to certain phrases, and struck the phrase "[e]ach of [e]xtended [d]uration" from the question addressing episodes of decompensation.

Axis II:          Antisocial personality disorder

Axis III:         Hepatitis C

Axis IV:          Stressors: economic, social environment and health problems

Axis V:           Current GAF=62; within the last year: 62

AR 245.[6]

He opined:

The claimant's participation effort appeared to be marginal.  She was not able to answer some basic questions.  Her symptoms of depression and anxiety appear to be within the mild range.  Her reported auditory hallucinations do not appear to be consistent with a formal thought disorder.  Her communication skills were fair. The claimant is currently receiving treatment for this disorder.  The claimant has a long history of antisocial behavior, including heavy drug and alcohol usage and numerous arrests.  The claimant has had a negative work history consisting of minimal work experience.  The likelihood of the claimant's mental condition improving within the next 12 months is fair.  The claimant appears to have a personality disorder which consists of poor interpersonal skills and anger problems.

AR 245-46.

Hirokawa assessed Plaintiff's residual functional capacity based only on her psychiatric condition:

The claimant's ability to understand and to remember very short and simple instructions is slightly limited.  The claimant's ability to understand and remember detailed instructions is slightly limited.  The claimant's ability to maintain attention and concentration is slightly limited.  The claimant's ability to accept instructions from a supervisor and respond appropriately is slightly limited. The claimant's ability to sustain an ordinary routine without special supervision is slightly limited.  The claimant's ability to complete a normal workday and workweek without interruptions at a consistent pace is slightly limited.  The claimant's ability to interact with coworkers is slightly limited.  The claimant's ability to deal with various changes in the work setting is slightly limited.  The likelihood of the claimant emotionally deteriorating in a work environment is minimal.

AR 246.

**Dr. Klein.**  On January 3, 2007, agency consultant Adi Klein, M.D., physically examined Plaintiff.  Her chief complaints were "psychiatric" and hepatitis C.  Although her hepatitis C had been diagnosed while she was in prison, she had never received any treatment for it.

---

[6] GAF 62 is near the bottom of the range GAF 61-70, which indicates "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Id.* at 34.

1    Klein noted that Plaintiff smelled of alcohol.  When he questioned her, she stated that she

2    had three beers earlier that day.

3         Other than the evidence of Plaintiff's alcohol consumption, the examination was

4    completely normal.  Klein identified alcoholism by exam and history, moderate obesity,

5    psychiatric (deferred to appropriate specialty), and hepatitis C by history with no residuals.  Klein

6    opined that Plaintiff's only restrictions were working at heights and operating machinery.

7         **Dr. Hurwitz.**  On March 7, 2007, Barry A. Hurwitz, Ph.D., performed the psychiatric

8    review technique for the agency.  He identified affective (mood) and personalty disorders that

9    were not severe.  Hurwitz opined that Plaintiff had mild restrictions of activities of daily living,

10   maintaining social functioning, and maintaining concentration, persistence, and pace.  She had no

11   episodes of decompensation.  Hurwitz found no evidence in the record that Plaintiff's substance

12   abuse contributed substantially to her mental impairment.

13        **Dr. Koretzky.**  On May 14, 2007, Martin B. Koretzky, Ph.D., prepared a psychiatric

14   review technique for the period from November 29, 2006, to May 14, 2007.  He identified

15   polysubstance addiction (in partial remission), affective (mood), and personalty disorders that

16   were not severe.  He noted that Plaintiff's opioid and cocaine dependence appeared to be in

17   sustained full remission but that she continued to drink alcohol.   Koretzky opined that Plaintiff

18   had no restrictions of activities of daily living, and mild restrictions in maintaining social

19   functioning, and maintaining concentration, persistence, and pace.  She had no episodes of

20   decompensation.

21        **Fresno County Mental Health.**  Frederic W. Lee, CMFT,[7] completed a mental health

22   assessment on February 22, 2008.  He noted severe depression; and moderate-to-severe anxiety;

23   thought process disturbance (ruminative, paranoid, and hallucinations); attention and

24   concentration; hyperactivity; traumatic stress; and impaired cognitive performance.  Plaintiff was

25   unemployed and had previously attempted suicide.  Moderate to severe health problems included

26

27        [7]  Lee's services were provided through First Step Outreach, apparently a Fresno County Mental Health
     program administered by Turning Point of Central California, Inc.  Treatment notes through September 18, 2008, are
28   recorded on Turning Point forms.

hepatitis C and obesity.  She had a history of stealing and incarceration.  Her affect was

appropriate, her social skills were adequate, and her behavior was within cultural norms.

On March 18, 2008, Lee prepared a mental health assessment and "First Step Outreach"

addendum.  He noted:

> Consumer comes to the program through a self-referral experiencing significant
> impairments in daily living/functioning due to: admitted illegal drug use; sadness
> and feelings of hopelessness; audio and visual hallucinations; paranoid thoughts
> of possible harm from others; worry and anxiety with occasional panic attacks;
> impulsive behavior patterns; and sleep disturbances, a lack of energy and interest
> in daily activities; and appetite disturbances.

AR 320.

Plaintiff reported smoking a half pack of cigarettes daily and recent alcohol consumption.

Her last use of heroin was two years earlier.  Plaintiff reported that she walked a lot and did not

like crowds.  Lee opined that her prognosis was good.

Lee's March 18, 2008 progress note explained that Plaintiff's anxiety and worry related to

her need to find shelter despite her lack of financial resources.  Psychiatrist Harold Tarpley,

M.D., spoke briefly with Plaintiff regarding the importance of taking her medications as

prescribed.

On July 10, 2008, case manager Narine Zifugharyan, MSW, noted that Plaintiff's

depression had increased and she was in physical pain.  Zifugharyan encouraged Plaintiff to stop

dwelling on her past, and to instead spend time with her grandchildren and get involved in

activities at the senior center.  On July 11, 2008, Plaintiff cancelled her appointment with

Zifugharyan, due to her mental health problems, physical pain, and inability to walk well.  On

July 16, 2008, Plaintiff and Zifugharyan discussed Plaintiff's depression and paranoia, a visual

hallucination "she used to have" about infant who disappeared from her hands, her decision to

quit using drugs, and her social isolation.  Zifugharyan concluded that Plaintiff required weekly

follow-up calls.

On July 24, August 11 and 13, and September 3, 2008, Zifugharyan and Plaintiff

discussed Plaintiff's continuing hallucination of the disappearing infant and guilty feelings for

having not been a caring mother to her children.  On September 11, 2008, Plaintiff reported that

1  she had played with her grandchildren and felt good about it.  On September 16, 2008, Plaintiff

2  discussed the recent deaths of two brothers and the effect on both Plaintiff and her elderly

3  mother.  Plaintiff asked Zifugharyan to complete papers for her attorney, presumably the

4  questionnaire ultimately signed by Tarpley.  The record includes no evidence of further treatment

5  at Turning Point.

6          On September 16, 2008, psychiatrist Harold Tarpley, M.D., completed substantially the

7  same five form pages as those completed by Dr. Green.[8]  Tarpley reported that Plaintiff

8  demonstrated symptoms of depression, mania, bipolar disorder, and anxiety.  He opined that

9  Plaintiff lacked the ability to relate and interact with people; to understand, carry out and

10  remember job-related instructions, whether simple or complex; to deal with the public; to

11  maintain attention and concentration for two-hour intervals; and withstand the stress and pressure

12  of day-to-day activity.  She was able to handle funds.  Her impairment would last her lifetime.

13  Tarpley acknowledged Plaintiff's history of drug and alcohol use but did not explain its relation

14  to her psychiatric disability as the form requested.  He also opined that Plaintiff had moderate

15  restriction of activities of daily living, maintaining social functioning, and maintaining

16  concentration, persistence or pace.  Tarpley did not indicate any episodes of decompensation.

17          On November 18, 2008, Plaintiff sought to refill her medications at Fresno County

18  Mental Health.  She turned down an offer of case management services, indicating that all she

19  needed were her medications and "a doctor to bounce her issues off of."  AR 339.  Nonetheless, a

20  plan of care dated November 20, 2008, assigned medication support services and case

21  management services.  Plaintiff complained of anxiety (panic attacks once or twice weekly and

22  trouble riding the bus), depression (sadness and social isolation), and daily agitation.  She stated

23  that she would try to attend AA twice weekly.   An unsigned form diagnosed Bipolar I Disorder.

24  The records also note that Dr. Tarpley had prescribed Klonopin.

25          A plan of care dated December 13, 2008, provided for medication services only.  Plaintiff

26  ───────────────

27       [8]  The form does not indicate that Tarpley is a doctor.  The handwriting on the form is substantially different
     from Tarpley's signature or the handwritten name beneath the signature, both of which appear to have been written

28  with the shaky hand of someone who is ill or very elderly.  The response to multiple items were "N/A," then crossed
     out and replaced with a more extensive answer.

1   denied the use of alcohol or illicit drugs.  Plaintiff "vaguely and hesitantly" reported auditory and

2   visual hallucinations, including her deceased brother's voice calling her, a baby girl crying, and a

3   man patting her back.

4       On March 12, 2009, Dr. McGee was assigned to supervise Plaintiff's medications.  On

5   March 13, 2009, Plaintiff's case manager, Charles Lee, CMHS II, assisted her in completing SSI

6   paperwork.

7       **Dr. Chen.**  The agency record includes the treatment notes of Chia Chen, M.D.,

8   Plaintiff's primary care physician, from June 25, 2007, through May 4, 2009.  Substantial

9   portions of the notes are illegible.  Chen's treatment of Plaintiff generally addressed minor and

10  routine ailments.  Although Chen noted some serious diagnoses, such as COPD, the notes report

11  no testing from which such diagnoses could have been or appropriate treatment of such disorders.

12      In July 2008, Chen ordered a chest x-ray to investigate Plaintiff's complaints of a cough

13  and shortness of breath.  Radiologist Yoshi Chang, M.D., reported that the x-ray revealed

14  cardiomegaly with mild interstitial edema and small effusions.

15      On May 4, 2009, Chen completed a questionnaire on which she indicated that Plaintiff's

16  primary impairments were arthritis and [indescipherable], based on Chen's objective findings of

17  arthritis, COPD, and dizziness.  Chen opined that Plaintiff's medical problems precluded her

18  performing full-time work at any exertion level.  Chen also indicated that Plaintiff's impairments

19  restricted her to doing no more than sedentary work; that her impairments precluded her from

20  occasionally lifting 20 pounds and frequently lifting ten pounds during an eight-hour work day;

21  and that Plaintiff was limited to light duty work.   At one time, without rest or support, Plaintiff

22  was able to sit four hours and stand or walk for two hours.  In one eight-hour period, Plaintiff

23  was able to sit four hours and stand or walk one hour.  Chen did not know how long Plaintiff had

24  been disabled.

25      **Vocational expert.**  Jose Chaparro testified as vocational expert.  Because Plaintiff had

26  no work history, Chaparro was unable to testify regarding transferability of skills or Plaintiff's

27  ability to return to a former job.

28      The ALJ directed Chaparro to assume for each hypothetical question an individual of the

same age, education, language, and experience as Plaintiff.  For the first hypothetical question, he

directed Chaparro to assume an individual not capable of handling funds, who was slightly

limited in his or her ability to understand and remember very short and simple instructions; to

understand and remember detailed instructions; to maintain attention and concentration; to accept

instructions from supervisors and respond appropriately; to sustain ordinary routine without

special supervision; to complete a normal workday or week; to interact with co-workers; and to

deal with various changes in the work setting.  The individual had minimal likelihood of

deterioration in the work environment.  Chaparro opined that such a person could do any

unskilled work in the national and regional economy.

For the second hypothetical question, the ALJ directed Chaparro to assume that the

individual had no prior work experience and marked limitations in his or her ability to relate and

interact with supervisors; to carry out, understand, and remember a variety of technical and

complex [*sic*]; to understand, remember and carry out simple one- to two-step [*sic*];  to interact

or deal with the public; to maintain attention or concentration; and to withstand stress.  This

individual was able to handle funds.  Chaparro opined that no work would be available for such a

person.

For the third hypothetical question, the ALJ directed Chaparro to assume that the

individual had moderate limits in activities of daily living; in maintaining social functioning; and

in maintaining concentration, persistence, and pace.  He or she lacked the ability to relate to and

interact with people; to understand and remember job related instructions; to carry out even one

and two step [*sic*]; to interact with the public; and to maintain attention and concentration for two

hours.  Chaparro opined that no work would be available for such an individual.

For the fourth hypothetical question, the ALJ directed Chaparro to assume a individual

who could lift and carry three pounds; sit 20 minutes at a time; and walk one-half block at a time.

The individual needs to rest and elevate his or her feet for 20 minutes twice daily at unscheduled

intervals.  He or she cannot concentrate in half hour increments and then must rest mentally for

an hour [*sic*].  The individual can grip or grasp for no more than two minutes at a time, then must

rest for 20 minute before being able to grip or grasp for another two minutes.  Chaparro opined

that no work would be available for such an individual.

For the fifth hypothetical question, the ALJ directed Chaparro to assume and individual who cannot work full time; who can lift and carry less than ten pounds; can sit six hours out of eight; can stand and walk two hours out of eight.  Chaparro opined that no work would be available for such an individual, nor for the same individual if he or she could sit only four hours out of eight.

## II.  Discussion

### A.  Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform |

any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of November 29, 2006.  Her impairments included obesity, history of asthma, low back pain and hip pain, history of alcoholism and hepatitis C by report, polysubstance abuse, and adjustment disorder with mixed emotional features.  None of these impairments, either individually or in combination, were severe since none would significantly limit Plaintiff's ability to perform basic work-related activities for twelve consecutive months.

**B.**     **Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

**C.**     **Did the ALJ improperly evaluate the physicians' opinions?**

Plaintiff contends that the ALJ improperly rejected the opinions offered by Chen and Tarpley, her treating physicians, in favor of the opinions of the agency's consulting and staff physicians.

1            **1.    Plaintiff's Credibility**

2            Although Plaintiff does not challenge the ALJ's conclusion that she was not credible, to

3    fully understand the hearing decision, acknowledging the centrality of Plaintiff's lack of

4    credibility to Judge Haubner's analysis is necessary.  Assessing Plaintiff's true medical and

5    physical condition is difficult because she told different health care providers different things.  In

6    reading the complete record, the Court observed that Plaintiff told providers what she thought

7    they needed to hear to cause each to provide whatever Plaintiff sought, whether it was attention,

8    medication, or completion of a form attesting to her "disability."

9            An ALJ is not "required to believe every allegation of disabling pain" or other non-

10   exertional requirement.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*,

11   885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's testimony after a

12   medical impairment has been established, the ALJ must make specific findings assessing the

13   credibility of the claimant's subjective complaints.  *Ceguerra v. Secretary of Health and Human*

14   *Services*, 933 F.2d 735, 738 (9th Cir. 1991).  "[T]he ALJ must identify what testimony is not

15   credible and what evidence undermines the claimant's complaints."  *Lester*, 81 F.3d at 834,

16   *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).

17   He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is

18   unpersuasive.  *Orn*, 495 F.3d at 635.  *See also Robbins v. Social Security Administration*, 466

19   F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently specific to permit the

20   court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v.*

21   *Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

22           When weighing a claimant's credibility, the ALJ may consider the claimant's reputation

23   for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct,

24   claimant's daily activities, claimant's work record, and testimony from physicians and third

25   parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social*

26   *Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary

27   techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent

28   statements concerning the symptoms, and other testimony by the claimant that appears less than

15

candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a

prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*,

533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If

the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her

decision.  *Thomas*, 278 F.3d at 959.

> The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.*  Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

> *Orn*, 495 F.3d at 635.

Judge Haubner addressed Plaintiff's lack of credibility in detail.  He noted the necessity

of evaluating a claimant's statements by assessing objective medical evidence; the claimant's

daily activities; the location, duration, frequency, and intensity of claimant's pain or other

symptoms; factors that precipitate or aggravate the symptoms; the nature and effectiveness of the

medication used to treat the symptoms; measures other than treatment that the claimant uses to

relieve the pain or symptoms; and any other factors relevant to Plaintiff functional restrictions

and limitations.  He observed Plaintiff's long history of complaints about body parts that x-rays

revealed to be normal or minimally impaired.  He pointed out Plaintiff's minimal participation

effort in Hirokawa's attempts to assess her mental state and her "inability" to answer basic

questions.

Plaintiff arrived for her appointment with the consulting internist with alcohol on her breath and readily admitted that she had been drinking. Judge Haubner noted Plaintiff's lack of candor regarding her drug and alcohol use:

> [T]he claimant's alleged alcohol termination dates seem to vary (e.g., quit using cocaine and alcohol one and on-half years ago; July 2005), but in March 2008, she said she had last used alcohol two weeks ago and last used drugs two years ago. Further muddying the waters, claimant testified that she has not used drugs since 2004 and no alcohol since the end of 2007.

AR 16 (*citations to record omitted*).

Her activities of daily living, including cooking, vacuuming, sweeping, mopping, pet care, bed making and yard work, belied her claims of physical impairment and pain. She told Klein she was able to take care of her own grooming needs. Although Plaintiff claimed to be fully compliant with her doctors' orders, she continued to smoke and admitted that she did not fully comply with her diet. The ALJ further noted:

> Regarding credibility, I note that Plaintiff has a dismal (nonexistent) work history so not working appears to be part of her adopted lifestyle. Furthermore, she has a history of crimes of moral turpitude (theft) although she specifically denied any other convictions besides controlled substance related.

AR 16 (*citations to record omitted*).

Finally, Haubner noted that Plaintiff frequently missed doctor's appointments and was not fully compliant with medication, indicating that Plaintiff's symptoms may not have been as limiting as she alleged.

Judge Haubner's examples merely scratch the surface of evidence strongly suggesting credibility issues. In April 2007, Plaintiff told Nenadov she had no hallucinations or delusions. She told Hirokawa she heard voices. In March 2008 she told Lee she had auditory and visual hallucinations. In July 2008, Plaintiff told Zifugharyan about a hallucination "she used to have" about a crying baby who disappeared from her hands. On July 24, 2008, she told Zifugharyan that she had a continuing hallucination about a crying baby who disappeared from her hands. In December 2008, when Plaintiff sought medication services from FCMH, Plaintiff "vaguely and hesitantly" reported auditory and visual hallucinations.

Similarly, Plaintiff told Lee that she walked a lot, but she testified that she could walk

1   only one-half block and needed to rest and elevate her feet for twenty minutes twice a day.  She

2   testified that she could grasp a coffee cup or pencil for only two minutes before needing twenty

3   minutes rest, but the record includes no references to hand pain or symptoms.  Although she

4   lived with her mother after her release from prison, she told Lee of her worries about finding

5   shelter with no financial resources in March 2008.  In short, substantial evidence supported the

6   ALJ's determination that Plaintiff lacked credibility.

7                              **2.      Evaluation of Doctor's Opinions**

8           Physicians render two types of opinions in disability cases: (1) medical, clinical opinions

9   regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to

10  perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ is "not bound

11  by an expert medical opinion on the ultimate question of disability."  *Tomasetti*, 533 F.3d at

12  1041; Social Security Ruling 96-5p.  The regulations provide that medical opinions be evaluated

13  by considering (1) the examining relationship; (2) the treatment relationship, including (a) the

14  length of the treatment relationship or frequency of examination, and the (b) nature and extent of

15  the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other

16  factors that support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

17          Three types of physicians may offer opinions in social security cases: "(1) those who

18  treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the

19  claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant

20  (nonexamining physicians)."  *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally

21  entitled to more weight than the opinion of a doctor who examined but did not treat the claimant,

22  and an examining physician's opinion is generally entitled to more weight than that of a non-

23  examining physician.  *Id.*  The Social Security Administration favors the opinion of a treating

24  physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A

25  treating physician is employed to cure and has a greater opportunity to know and observe the

26  patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).  Nonetheless, a treating

27  physician's opinion is not conclusive as to either a physical condition or the ultimate issue of

28  disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Once a court has considered the source of a medical opinion, it considers whether the Commissioner properly rejected a medical opinion by assessing whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The ALJ may reject the uncontradicted opinion of a treating or examining medical physician only for clear and convincing reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 831. Even though the treating physician's opinion is generally given greater weight, when it is contradicted by an examining physician's opinion that is supported by different clinical findings the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence and make a finding. *Magallanes*, 881 F.2d at 751-55. Without specific and legitimate reasons to reject the opinion, the ALJ must defer to the treating or examining professional. *Lester*, 81 F.3d at 830-31. The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.

Although an ALJ is not bound by opinions rendered by a plaintiff's physicians regarding the ultimate issue of disability, he or she cannot reject them out of hand, but must set forth clear and convincing reasons for rejecting them. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993). A general statement that objective factors or the record as a whole are insufficient: the ALJ must tie the objective factors or the record as a whole to the opinions and findings that he or she rejects. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

## 2. **Dr. Green**

The terms of Plaintiff's parole included psychological therapy and evaluation by Nathan Nenadov, a licensed clinical social worker, and medication supervision by psychiatrist Henry Green, M.D. The ALJ wrote:

> The claimant has been involved in mental health treatment as a condition of her parole and was diagnosed with mood disorder (not otherwise specified), opoid dependence, and cocaine dependency ( in remission) with a global assessment of functioning at 60. The claimant was stable and doing well on medications.
>
> AR 15.

1     Relying solely on the Medical Source Statement, Psychiatric (included in the record at

2     AR 289-293), Plaintiff contends that the ALJ erred in failing to request Green's treatment

3     records. Plaintiff does not acknowledge the records of the Parole Outpatient Clinic, included in

4     the record at AR 234-241. Dr. Green's having treated Plaintiff at the Parole Outpatient Clinic,

5     his notes are included there. Plaintiff did not claim below that some portion of Green's records

6     were missing. Neither Plaintiff's brief nor the record even suggests that any additional records

7     exist. Even assuming additional records existed, the Court is baffled regarding how Judge

8     Haubner would have known that any records were missing. "[A]ppellants must raise issues at

9     their administrative hearings in order to preserve them on appeal before this Court." *Meanel v.*

10    *Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999)

11    In any event, "[t]he claimant bears the burden of proving that she is disabled." *Id.* at 1113.

12    As a result, she is responsible for providing "complete and detailed objective reports of her

13    condition from licensed medical professionals." *Id.*, *quoting Johnson v. Shalala*, 60 F.3d 1428,

14    1432 (9th Cir. 1995). *See* 20 C.F.R. §§ 404.1512(a)-(b) and 404.1513(d). "Ambiguous evidence,

15    or the ALJ's finding that the record is inadequate to allow for proper evaluation of the evidence,

16    triggers the ALJ's duty to 'conduct an appropriate inquiry.'" *Tonapetyan v. Halter*, 242 F.3d

17    1144, 1150 (9th Cir. 2001), *quoting Smolen*, 80 F.3d at 1288. Since the evidence below was

18    neither ambiguous nor inadequate to allow review, the ALJ was not required to request further

19    records from Dr. Green.

20    Since Green's treatment notes are included within the administrative record, there is no

21    need to compare his July 20, 2007 opinion to the notes and opinions of Dr. Tarpley who appears

22    to have had his first brief encounter with Plaintiff in March 2008, as Plaintiff proposes. Green's

23    opinion, that Plaintiff had mild restriction of activities of daily living; moderate difficulties in

24    maintaining social functioning; marked difficulties in maintaining concentration, persistence or

25    pace; and had experienced one or two episodes of decompensation, but not of extended duration,

26    contrast sharply with his own treatment notes and with the notes of Nenadov, the therapist with

27    whom Green worked.

28    Plaintiff reported some mental health issues when Nenadov conducted her intake

20

interview, but she had stopped taking a full dose of Seroquel and had run out Trazodone over a

month before.  Nonetheless, Nenadov reported that Plaintiff was stable and functioning well with

no problems or concerns.  Green's reports, tied to the renewals of her prescriptions every ninety

days, were generally not substantial, which is not surprising since his role was only to supervise

medications, with Nenadov conducting the therapy sessions.  On July 19, 2006, Green observed

that Plaintiff displayed appropriate affect and no evidence of psychosis.  At appointments with

Green on July 28, and October 11, 2006, Plaintiff was doing well.  Nenadov similarly reported

that Plaintiff was doing well.  She complied with treatment.  Although she continued to

experience depressive symptoms, she did not do so daily.

In addition to the positive stream of treatment notes, Green's opinion was also internally

inconsistent since he began by opining that Plaintiff had shown marked improvement in nearly

all functional areas.  Since Plaintiff was stable and functioning with only moderate difficulties

when she first reported to the Parole Outpatient Clinic, the ALJ did not err in concluding that

Green's July 2007 opinion was not consistent with his treatment notes and in giving it little

weight.

### 3. **Dr. Tarpley**

Records of Plaintiff's treatment through Fresno County Mental Health follow a peculiar

course.  By the time of Plaintiff's intake interview for First Step Outreach in March 2008, the

agency had twice denied Plaintiff's application for SSI, and Plaintiff had already requested a

hearing before an ALJ.  Services at the Parole Outpatient Clinic would have ended on October

30, 2007, which was the controlling discharge date for her parole.  Accordingly, between the end

of October and late February when Plaintiff finally contacted Fresno County Mental Health,

Plaintiff appears to have been without therapy and eventually without her prescriptions.  Not

surprisingly, therapist Frederic Lee's intake evaluation on February 22, 2008, diagnosed severe

depression and moderate to severe anxiety. Nonetheless, Plaintiff was required to wait 21 days

after her first contact without the using illegal drugs, then test clean, before services were

provided.

When Plaintiff returned and was accepted for services on March 18, 2008, Lee noted that

Plaintiff was experiencing a variety of mental health issues, all based on Plaintiff's self reports, which included the peculiar explanation that Plaintiff's anxiety related to her need to find shelter, even though the agency record documents that Plaintiff was living with her mother. Plaintiff's impaired credibility is on full display when the Turning Point records are considered in the context of all the materials provided to the agency.

Tarpley was apparently involved early in the treatment as the psychiatrist prescribing Plaintiff's medications, but his role was limited and treatment records do not include any notes prepared by Tarpley. When case management transferred to social worker Zifugharyan in July, Zifugharyan considered Plaintiff's condition to have suddenly worsened and determined that Plaintiff required more frequent services than Turning Point had provided. The record documents that Plaintiff received therapy from Zifugharyan for approximately two months (with Plaintiff frequently cancelling appointments) until Plaintiff gave Zifugharyan the Mental Source Statement, Psychiatric, which Tarpley ultimately signed. Plaintiff then stopped seeing Zifugharyan and apparently sought no further treatment until November 2008, when she returned to Fresno County Mental Health, seeking renewal of her prescriptions and refusing case management services.

As detailed in the factual statement, Tarpley opined that Plaintiff suffered from moderate restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace. He also opined that Plaintiff lacked most functional skills and that her impairment was permanent. But the questionnaire provided no detail to support Tarpley's opinions and the absence of any treatment notes provided no basis for evaluation. The ALJ minimized the opinion:

> Just before the hearing, the claimant's representative submitted an additional check-the-blocks/fill-in form with handwritten interpretations by the Representative's office, which would preclude substantial gainful activity. However, it is also given little weight as it lacks all signs symptoms or bases other than mentioning "mental health issues." See *Matney v. Sullivan*, 981 F.2d 1016, 1019-20 (9th Cir. 1992) where it was held that an ALJ need not accept a treating physician's opinion if it is conclusory and brief, ans unsupported by clinical findings. Furthermore, the other substantial evidence (discussed in this decision) does not fully support the conclusions in Exhibit 18F. Also, since there is no degree listed behind the signer's name (e.g. "MD" or "PhD"), it is impossible to tell if that person is even an acceptable source (Social Security Ruling 06-3p).

1      AR 17 (*citations to agency record omitted*).

2      Plaintiff contends that the ALJ rejected Tarpley's opinion for invalid reasons: (1) the ALJ

3   claimed Tarpley's acceptability as a medical source was unclear even though he could have

4   identified Tarpley as a psychiatrist by searching the internet; (2) the ALJ rejected Tarpley's

5   questionnaire as submitted by Plaintiff's representative; (3) the ALJ claimed the report lacked

6   signs and symptoms although it was supported by Turning Point records; and (4) any

7   inconsistency with other medical records could be explained by the passage of time.

8      Plaintiff's first objection is silly.  The administrative records includes no treatment notes

9   or other records of direct treatment by Tarpley.  Tarpley is mentioned only a few times in

10  Plaintiff's treatment records: His signature on his opinion does not identify that he is a physician

11  or his role in her treatment.  The ALJ was not required to search the internet to identify Tarpley.

12  Since Plaintiff's representative submitted the form just before the hearing, she could easily have

13  identified Dr. Tarpley with a cover letter but did not bother to do so.

14      In addition, because the opinion was submitted as a separate exhibit from the Turning

15  Point records and did not identify Tarpley as affiliated with Turning Point, nothing in the record

16  suggested to the ALJ that he ought to review the Turning Point record, composed of the

17  treatment notes of Lee and Zifugharyan, to identify Tarpley or evaluate the basis for Tarpley's

18  opinions. The ALJ was not required to comb the record or search the internet to identify the role

19  of a treating professional.

20      Similarly, there is no basis for Plaintiff's contention that Tarpley's perfunctory opinions

21  should have been evaluated based on the treatment notes of other mental health professionals.

22  Plaintiff would have the ALJ and this Court evaluate Tarpley's opinions based on the treatment

23  notes of two social workers.  Although an ALJ may consider the opinions of social workers, they

24  are not acceptable medical sources.  20 C.F.R. § 404.1513(a), (d).

25      Whether the ALJ intended to reject the form as having been submitted by Plaintiff's

26  representative is unclear.  The more relevant consideration expressed in the first sentence of the

27  opinion is the form's check-the-blocks/fill-in-the-form format, which is disfavored as an

28  unsupported opinion.  An ALJ need not give weight to a conclusory opinion supported by

23

minimal clinical findings.  *Meanel*, 172 F.3d at 1113; *Magallanes*, 881 F.2d at 751.  But even if the ALJ intended to reject the opinion for its having been submitted by Plaintiff's representative, the error was undoubtedly harmless, outweighed by the complete lack of support for Tarpley's opinion.

Finally, Plaintiff argues that the disparity between Tarpley's opinion and the balance of the administrative record could have been attributable to the passage of time.  No legal or factual basis exists for that speculative proposition.  The ALJ did not err in rejecting Tarpley's unsupported and inconsistent opinion.

### 4.   Dr. Chen

Plaintiff contends that the ALJ erred "in rejecting Dr. Chen's opinion for the same invalid reasons he rejected Dr. Tarpley's opinion."  Perhaps Plaintiff means that the ALJ should have accepted Chen's treatment notes as sufficient support for her conclusion that Plaintiff was physically disabled: the brief does not explain the nature of her claim.  The Court will not speculate on what Plaintiff intended to claim.

The ALJ opined only that "The check-the-blocks/fill-in form f[or]m from Dr. Chen that was produced just before the hearing is also given little weight as it too lacks all signs and symptoms and is not consistent with consultative examiners' or State Agency physicians' opinions."  AR 17 (*citations to agency record omitted*).  Not only did Chen also submit a check-the-blocks/fill-in-the-blanks form, she appeared not to understand it, simultaneously opining that Plaintiff could not do full-time work at any exertion level, that Plaintiff could do no more than sedentary work, and that Plaintiff was limited to light duty work.  Without further analysis, the value of the opinion was minimal.

In addition to the form's internal inconsistencies, the degree of impairment that Chen reported was not consistent with the minimal, routine care reported in Chen's notes.  Although Chen "diagnosed" arthritis and COPD, there is no evidence of any bases for these diagnoses other than Plaintiff's subjective reports of shortness of breath and swollen ankles, and her report on intake to Chen's practice that she used an albuterol inhaler for asthma. The only treatment Chen prescribed for breathing problems was an albuterol inhaler.  The sole treatment for arthritis

was Naproxen of a strength available to anyone without prescription.  The sole evidence of Plaintiff's supposed hospitalization for breathing problems is a note that Plaintiff's son told Chen's office staff that Plaintiff had been hospitalized.

Chen's treatment notes are consistent with Dr. Klein's consultative physical evaluation which concluded that Plaintiff's physical condition was normal.  Chen's extreme, though confused, opinion on Plaintiff's ability to work was inconsistent both with other medical records and with Chen's own treatment notes.

In addition, Plaintiff's own reports of her daily activities, which laundry, cooking, trash removal, bed making, mopping, shopping, walking, and pet care, were inconsistent with the degree of impairment to which Chen opined.  The ALJ's determination was supported by substantial evidence.

### 5.   Summary

The ALJ properly evaluated the opinions of the various physicians.

## III.   Conclusion and Recommendation

A review of applicable law and facts indicates that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled.  Accordingly, the undersigned recommends that the District Court affirm the Commissioner's determination.

///
///
///
///
///
///
///
///
///
///

These Findings and Recommendations will be submitted to the Honorable Lawrence J. O'Neill, United States District Judge, pursuant to the provisions of 28 U.S.C § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, Plaintiff may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that, by failing to file objections within the specified time, she may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:    January 6, 2012            /s/ Sandra M. Snyder**
                              UNITED STATES MAGISTRATE JUDGE